IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIFFANY RODEBAUGH O/B/O ) <br> ANDREIGHA MIHALY, ) <br>            ) <br>     Plaintiff, ) <br>            ) <br>     v. ) <br>            ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security,[1] ) <br>            ) <br>     Defendant. ) | Civil Action No. 06-228 Erie |

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

     Plaintiff, Andreigha Mihaly, by and through her mother, Tiffany Rodebaugh, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for child's supplemental security income ("SSI") under Titles XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. Ms. Rodebaugh filed an application for SSI on Plaintiff's behalf on May 29, 2003, alleging that she became disabled on May 27, 2003 due to epilepsy (Administrative Record, hereinafter "AR", 42-43; 49). Her application was denied, and she requested a hearing before an administrative law judge ("ALJ") (AR 30-35). A hearing was held before an administrative law judge ("ALJ") on March 28, 2005 (AR 223-248). Following this hearing, the ALJ issued a written decision on August 26, 2005 finding that Plaintiff was not entitled to SSI under the Act (AR 17-21). Her request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

### I. BACKGROUND

     Plaintiff was born on July 14, 1992 and was thirteen years old on the date of the ALJ's

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), he is automatically substituted as the defendant in this case.

decision (AR 18). The medical evidence before the ALJ consisted of the following:[2] Plaintiff presented to the emergency room on April 27, 2003 with her mother, who reported that Plaintiff passed out for two to three minutes while vomiting (AR 133- 134). Plaintiff was diagnosed with gastroenteritis and syncope, and discharged in stable condition (AR 136).

Plaintiff was seen by Jennifer Bishop, M.D., her family physician, on April 29, 2003 for follow-up after her emergency room visit (AR 150). Ms. Rodebaugh relayed that Plaintiff was "out of it" for approximately 45 minutes after the seizure (AR 150). Dr. Bishop assessed Plaintiff with a possible focal seizure turning into a possible generalized seizure (AR 150).[3]

Plaintiff underwent an MRI of the brain on May 6, 2003 which was normal (AR 146). An EEG conducted on the same date by Patricia Crumrine, M.D., Director of EEG, Division of Child Neurology at Children's Hospital of Pittsburgh, was markedly abnormal with generalized spike wave and polyspike wave patterns suggestive of generalized epilepsy (AR 143-144). A video EEG conducted on May 27, 2003 showed frequent bursts of generalized spike and wave discharges ranging from three to five seconds (AR 157; 178).

Dr. Crumrine performed a pediatric epilepsy evaluation of Plaintiff on May 27, 2003 (AR 155-158). She summarized Plaintiff's medical history, noting her first convulsive seizure occurred one month past (AR 155). Ms. Rodebaugh reported that there had been a significant deterioration in Plaintiff's school performance over the past two grading periods but no staring spells were noted by her or Plaintiff's teachers (AR 155). Dr. Crumrine reported that Plaintiff's neurological examination was normal and she had normal muscle strength and tone (AR 157). She formed an impression of generalized epilepsy with single generalized tonic-clonic seizure;[4]

---

[2] Both parties in their Briefs before this Court cite to medical evidence which was submitted to the Appeals Council but not considered by the ALJ in rendering his decision. It is well settled however, that pursuant to *Matthews v. Apfel,* 239 F.3d 589, 593 (3rd Cir. 2001), we cannot consider this evidence in our substantial evidence review of the ALJ's decision.

[3] Generalized seizures cause loss of consciousness and motor function from the onset. *The Merck Manual* 1402 (17th ed. 1999). Types of generalized seizures include infantile spasms and absence, tonic-clonic, atonic, and myoclonic seizures. *Id.*

[4] Generalized tonic-clonic seizures "typically begin with an outcry; they continue with loss of consciousness and falling, followed by tonic, then clonic contractions of the muscles of the

suspected absence seizures;[5] and possible myoclonic seizures[6] (AR 157-158). Dr. Crumrine was unsure whether Plaintiff fit the clinical picture of juvenile myoclonic epilepsy since the history of myoclonic events were vague and there was no documentation of that clinical pattern on her video EEG (AR 158). She recommended that Plaintiff be placed on Depakote, an anti-epileptic medication (AR 158).

On July 8, 2003, Plaintiff was seen by Dr. Crumrine for follow-up (AR 167-168). Ms. Rodebaugh reported that Plaintiff continued to have staring spells which lasted for several seconds daily (AR 167). She also described two other episodes; one in which Plaintiff was "out of it" for a period of time and another in which her eyes rolled back while she slept (AR 167). Dr. Crumrine reported that Plaintiff's neurological and physical examination was normal, and diagnosed her with general versus complex partial with secondary generalization seizures (AR 168). She increased Plaintiff's Depakote level, and advised her to avoid biking and aerial activities until her seizures were controlled (AR 168). Shortly thereafter, Ms. Rodebaugh telephoned Dr. Crumrine's office reporting that Plaintiff was acting very mean with the increased dosage level and complaining of stomach upset (AR 193).

On July 16, 2003, Dilip S. Kar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff's epilepsy was a severe impairment, but that she did not meet, medically equal or functionally equal the Listings (AR 160). He found she had no limitation in acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for herself; and was

---

extremities, trunk, and head. Urinary and fecal incontinence may occur. Seizures usually last 1to 2 min[utes]." *Id.* at 1403.

[5]Absence seizures, formerly called petit mal "consist of brief, primarily generalized attacks manifested by a 10- to 30-sec[ond] loss of consciousness and eyelid flutterings at a rate of 3 [per second], with or without loss of axial muscle tone. Affected patients do not fall or convulse; they abruptly stop activity and resume it just as abruptly after the seizure, with no postictal symptoms or even knowledge that an attack has occurred." *Id*. at 1402.

[6]Myoclonic seizures are "brief, lightning-like jerks of a limb, several limbs, or the trunk. They may be repetitive, leading to a tonic-clonic seizure. There is no loss of consciousness." *Id*. at 1403.

less than markedly limited in her health and physical well-being (AR 161-163).

Plaintiff missed her September 2, 2003 appointment with Dr. Crumrine (AR 193).

Plaintiff returned to Dr. Bishop's office on September 12, 2003 and was seen by M. Best, a certified registered nurse practitioner (AR 188). Plaintiff complained of vomiting off and on, as well as a sore throat and fever (AR 188). Ms. Best diagnosed Plaintiff with an upper respiratory infection with pharyngitis, and possible reflux due to the vomiting (AR 188). Ms. Best noted that Plaintiff had a history of seizure problems, with no recent grand mal seizures, but small petit mal seizures "off and on" (AR 188). Ms. Rodebaugh reported that Plaintiff had discontinued the Depakote one month earlier since she did not like how it made her feel (AR 188). She requested that Plaintiff be prescribed an anti-seizure medication, but Dr. Bishop referred her back to the Children's Hospital for Plaintiff's medication regulation (AR 188). Ms. Best cautioned her on the dangers of Plaintiff discontinuing seizure medication abruptly (AR 188).

A patient telephone call record dated October 6, 2003 from Dr. Bishop's office indicates that Ms. Rodebaugh called and reported that Plaintiff was missing school frequently due to sleeping a lot (AR 187). The Depakote reportedly "made her mean" and she had been off it for approximately two months and had missed her last appointment with neurology due to car trouble (AR 187). It was noted that Plaintiff had mostly absence seizures, but had one generalized seizure (AR 187). Dr. Bishop prescribed a low dose of Tegretol (AR 187).

Plaintiff missed her February 3, 2004 appointment with Dr. Crumrine (AR 193). On March 31, 2004, Ms. Rodebaugh telephoned Dr. Crumrine's office stating that Plaintiff was doing poorly in school, and every morning saw flashes of light and her eyes rolled back (AR 193). She further reported that Plaintiff's family physician had changed her medication to Tegretol, and Plaintiff had been missing doses and throwing things (AR 193). According to Ms. Rodebaugh, Plaintiff's teachers reported that she was not concentrating in school (AR 193). Dr. Crumrine encouraged her to schedule Plaintiff for another video EEG (AR 193).

Ms. Rodebaugh telephoned Dr. Crumrine's office on April 12, 2004 and reported that Plaintiff rarely took her medication and continued to have seizure activity in the morning and occasionally throughout the day (AR 193). She reported that Plaintiff's eyes rolled back with

some blinking, staring and stuttering (AR 193).

On May 15, 2004, she reported to Dr. Crumrine's office that Plaintiff's seizure activity was continuing, and Dr. Crumrine recommended that Plaintiff discontinue the Tegretol and started her on Lamictal (AR 193).

Progress notes from Dr. Bishop's office dated September 2, 2004 showed that Plaintiff's last seizure had been in May 2004 and that her staring episodes were "much better" (AR 185).

Plaintiff returned to Dr. Crumrine on October 21, 2004 (AR 193-195). Plaintiff's physical and neurological examination was normal (AR 194). Ms. Rodebaugh reported that Plaintiff was tolerating the Lamictal "very well" and her mood was much better (AR 193). Her seizure episodes occurred daily four to five times in the morning, and were described as mainly staring episodes lasting only a few seconds, with no myoclonic activity or generalized tonic-clonic activity (AR 193). It was noted that Plaintiff had failed the previous year due to 27 days of absence but was repeating the 6th grade and doing very well (AR 194). Dr. Crumrine formed an impression that Plaintiff continued to have staring episodes every morning lasting several seconds and one to two times per week with clusters of staring episodes (AR 194). She increased her Lamictal dosage and recommended another video EEG when her seizures were controlled (AR 194).

On January 24, 2005, Ms. Rodebaugh telephoned Dr. Bishop's office and reported that Plaintiff had suffered a seizure of three to four minutes duration and had turned blue (AR 184).

On January 31, 2005, Julia L. Dlugos, CRNP from Children's Hospital, stated in a letter to the school nurse that Plaintiff had absence seizures and myoclonic seizures, and had also experienced generalized tonic-clonic seizures (AR 197). Ms. Dlugos further stated that Plaintiff's seizures consisted of the following signs and symptoms: staring episodes lasting several seconds, eyes rolling back, eyes blinking and stuttering, and that stiffening and jerking of her extremities had also occurred with the generalized tonic clonic seizures (AR 197). Ms. Dlugos' correspondence advised the school on the proper procedures to be followed should Plaintiff suffer a seizure while at school (AR 197).

On March 7, 2005, Ms. Rodebaugh telephoned Dr. Bishop's office and reported that Plaintiff had suffered a seizure that morning and had a bad headache (AR 184). On March 9,

2005, Plaintiff was seen by Ms. Best at Dr. Bishop's office (AR 183).  Ms. Rodebaugh recounted the seizure incident and reported that Plaintiff had been disoriented the past two mornings (AR 183).  Plaintiff complained of dizziness off and on and her mother noticed she was more off balance (AR 183).  It was noted that Children's Hospital had increased her Lamictal dosage (AR 183).  On physical examination, Plaintiff exhibited a mildly positive Romberg's test (AR 183).[7] Ms. Best noted that her seizures "were becoming a little more frequent" and recommended she undergo an MRI (AR 183).

On March 24, 2005, Regina A. Fenton, CRNP for Dr. Crumrine, stated in a letter addressed to "Whom It May Concern" that Plaintiff was under her care for generalized epilepsy (AR 196).  She further stated that Plaintiff had seizure activity in the morning which made it difficult for her to function and that her medication was being adjusted (AR 196).  Ms. Fenton requested that Plaintiff's classes be arranged so that she could arrive at school at approximately 10:00 a.m. until her seizures were better controlled (AR 196).

Finally, an MRI of Plaintiff's head conducted on March 31, 2005 showed no evidence of intracranial disease (AR 199).

Plaintiff and her mother testified at the administrative hearing held by the ALJ on March 28, 2005 (AR 223-248).  Plaintiff testified that although she had attended a cyber school, the school district held her back a year due to absenteeism (AR 229-230).  She was in the 6th grade and doing well in science, spelling and English, but not as well in social studies and math (AR 228).  She rode the bus to school without any problems (AR 231).  Plaintiff testified that she had staring spells every morning and occasionally in the afternoon while at school, which lasted for one to two seconds (AR 233).  Her staring episodes occurred without warning, but a seizure was precipitated by a blackout or a flash like lightening (AR 235). She was not aware when her staring episodes occurred, and her teachers would tell her she was not paying attention (AR 230-231).  Plaintiff testified that she had no problems after the staring episodes, but felt confused and sometimes felt shaky (AR 233-234; 239).  She indicated that she was compliant with her

---

[7]In a Romberg test, the subject stands "with feet approximated ... [and] with eyes open and then closed. [I]f closing the eyes increases the [subject's] unsteadiness, ... the sign is positive." *Stedman's Medical Dictionary* 1640 (27th ed. 2000).

medication regime, but acknowledged that she had quit taking her prior medication because it made her "mean" and upset her stomach (AR 231-233). Plaintiff testified that she had less problems since she took her medication on a regular basis (AR 236). Plaintiff further testified that her problems had not interfered with her abilities in any way (AR 236).

Mrs. Rodebaugh testified that Plaintiff's last two "big" episodes occurred on January 24, 2005 and March 7, 2005 wherein her entire body stiffened and shook, her eyes rolled back and her lips turned blue (AR 243-244). Following these two incidents, Plaintiff had a stomach ache, severe headache and slept the rest of the day (AR 244). She further testified that Plaintiff's staring episodes continued, she was clumsy and stumbled and suffered from fatigue (AR 244-245).

The ALJ rendered his decision on August 26, 2005 (AR 17-22). He found that the Plaintiff had not engaged in any substantial gainful activity during any part of the relevant time period (AR 18). He further found that Plaintiff suffered from epilepsy, which was a severe impairment under the Act, but did not meet, medically equal or functionally equal the criteria of Listing 111.03, Nonconvulsive epilepsy, as set forth in 20 C.F.R., Part 404, Subpart P, Appendix 1, 20 C.F.R. § 416.924(d) (AR 18-19). Regarding functional equivalence, the ALJ concluded that the Plaintiff's epilepsy caused a "less than marked" limitation in moving about and manipulating objects, and in her health and physical well-being, but did not cause marked or extreme limitations in any other domain (AR 19-20). Finally, the ALJ found that Plaintiff's subjective complaints, as well as those articulated by her mother, were generally credible to they extent they were reasonably supported by the record, and that the observations of other sources, such as Plaintiff's teachers, were equally probative (AR 21). The ALJ concluded that the Plaintiff was not disabled under the Act and not entitled to child's SSI. (AR 22). Plaintiff's request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 5-8). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

To qualify for SSI, a claimant must demonstrate that she is "disabled," defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 1382c(3)(A).

Disability for children is determined by considering first whether the child is performing substantial gainful activity. 20 C.F.R. § 416.924(b). Second, the child must have a medically determinable impairment that is severe. 20 C.F.R. § 416.924(c). Finally, the child's "impairment(s) must meet, medically equal, or functionally equal the listings." 20 C.F.R. § 416.924(d). Functional equivalence for a child is determined by considering how the child functions in her activities in six broad areas or domains, including: (I) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) ability to care for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). An impairment is functionally equivalent to a listed impairment if a child demonstrates "marked" limitations in two of the above domains or "extreme" limitations in one domain. 20 C.F.R. § 416.926a(a). As indicated, the ALJ found that the Plaintiff had a less than marked limitation in the domains of moving about and manipulating objects and health and well-being, but no limitations in any other domain (AR 19-20).

Here, Plaintiff challenges the ALJ's finding at step three of the sequential evaluation process. Step three requires a determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1. 20 C.F.R. § 416.924(d). A claimant who meets or medically equals all of the criteria of an

impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Commissioner*, 220 F.3d 112, 119 (3rd Cir. 2000). A claimant bears the burden of proving that her impairment meets or equals a listed impairment. *See Adorno v. Shalala,* 40 F.3d 43, 46 (3rd Cir. 1994). For a claimant to meet a Listing, her impairment must meet *all* of the elements set out in the definition of a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Plaintiff contends that the ALJ erroneously found that she did not meet the Listing for nonconvulsive epilepsy as set forth at 111.03, 20 C.F.R. Pt. 404, Subpt. P, App. 1. This section describes the conditions which must be present for a finding of disability:

> 111.03 *Nonconvulsive epilepsy.* In a child with an established seizure disorder, the occurrence of more than one minor motor seizure per week, with alteration of awareness or loss of consciousness, despite at least three months of prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 111.03. In her Brief, Plaintiff cites to her various diagnoses, EEG results, and treatment records in support of her claim that her seizure disorder meets Listing 111.03. However, Plaintiff's reliance on these records is misplaced; the issue is not whether Plaintiff's seizure disorder is a severe impairment. Rather, the issue is whether Plaintiff's epilepsy, which the ALJ specifically found was a severe impairment, meets the specific requirements of the Listing. In this regard, the ALJ concluded the following:

> The evidence in the present case indicates that the child's epilepsy does not meet or medically equal ... Listing [111.03]. Specifically, evidence indicates that the child suffers from "staring episodes" only, for the most part, which occur in the morning, lasting for only seconds, and occurring in clusters of no more than 1 to 2 per week (Exhibits 11F and 13F). The child suffered from a more serious seizure in May 2003, when she was initially diagnosed with epilepsy, and also suffered from a significant seizure, causing her to turn blue, in January 2005, with another less-severe seizure in March 2005 (Exhibits 4F and 10F); however, the child only experiences staring spells, occurring 1 to 2 times a week, with no alteration of awareness or loss of consciousness noted, and, in fact, there is no medical confirmation of actual seizure activity. As such, her condition does not meet or medically equal Listing 111.03 (AR 19).

We find that the ALJ's conclusion that Plaintiff's seizure disorder did not meet Listing 111.03 is supported by substantial evidence. As outlined in the Listing, Plaintiff must suffer from

minor motor seizures occurring more than once per week accompanied by alteration of awareness or loss of consciousness despite at least three months of treatment. "Minor motor seizures" are seizures that cause contraction of muscles but do not become tonic-clonic seizures.[8] Common types of minor motor seizures are myoclonic and atonic.[9] As indicated previously, myoclonic seizures are brief, lightning-like jerks of a limb, several limbs, or the trunk, and may be repetitive, leading to a tonic-clonic seizure, with no loss of consciousness.[10] Atonic seizures are characterized by complete loss of muscle tone and consciousness.[11]

Here, as recognized by the ALJ, Plaintiff had a seizure in May 2003, a significant seizure in January 2005 where she turned blue, and another seizure in March 2005[12] (AR 150; 184). However, they did not meet the frequency requirement under the regulations. While the staring spells meet the frequency requirement of the Listing, there is no indication that in conjunction with these "staring spells" Plaintiff suffered muscle contractions or loss of muscle tone. Indeed, in October 2004, Plaintiff and her mother specifically denied any myoclonic activity associated with these episodes, and Dr. Crumrine referred to these episodes as staring episodes and not seizures (AR 194). Based on the above, we find substantial evidence supports the ALJ's conclusion that Plaintiff did not medically meet the Listing for nonconvulsive epilepsy.

---

[8]http://www.epilepsy.com/epilepsy/glossary.html (Last visited May 7, 2007).

[9]http://www.ccspublishing.com/journals4a/seizure_disorders.htm (Last visited May 7, 2007).

[10]*The Merck Manual* 1403 (17th ed. 1999); *see also* Nancy Foldvary & Elaine Wyllie, *Epilepsy, in* TEXTBOOK OF CLINICAL NEUROLOGY 1059, 1064 (Christopher G. Goetz & Eric J. Pappert, 1999).

[11]*The Merck Manual* 1403 (17th ed. 1999); *see also* Nancy Foldvary & Elaine Wyllie, *Epilepsy, in* TEXTBOOK OF CLINICAL NEUROLOGY 1059, 1063 (Christopher G. Goetz & Eric J. Pappert, 1999).

[12]Our reading of the record indicates that Plaintiff's first reported seizure may have actually occurred at the end of April 2003 and not May 2003 (AR 133-134). This factual misstatement however, does not impact or change our analysis.

We further find no error with the ALJ's conclusion that Plaintiff's seizure disorder did not functionally meet Listing 111.03. In making this determination, the ALJ relied on medical evaluations, school records and statements from Plaintiff and her mother. The ALJ found that there was no indication that Plaintiff's epilepsy had any effect on her ability to acquire and use information (AR 20). Although Plaintiff failed the prior school year due to excessive absences, she was reportedly doing very well in the 6th grade (AR 20). The ALJ further found there were no documented social functioning deficits or difficulties taking care of her own personal needs (AR 20).

In the domain of moving about and manipulating objects, the ALJ found that Plaintiff's limitations were "less than marked" (AR 20). Contrary to the state agency physician's opinion, who found that Plaintiff had no limitation in this domain, the ALJ concluded that she should refrain from climbing or balancing due to her seizure disorder (AR 20). He noted that other than her seizure disorder, Plaintiff was in good health (AR 20). He found that her condition was better controlled given her compliance with medication and adjustments to her medication regime (AR 20).

Finally, the ALJ concluded that Plaintiff had a "less than marked" limitation in the domain of health and well-being (AR 20). He noted that the testimony indicated Plaintiff became tired and suffered from headaches due to her seizures (AR 20). Otherwise, she was in good health and no other difficulties with her overall health and functioning were indicated by her treatment for her seizure disorder (AR 20). All of the ALJ's findings are supported by the record and consequently, his conclusion that Plaintiff did not functionally meet Listing 111.03 is supported by substantial evidence.

### IV. Conclusion

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIFFANY RODEBAUGH O/B/O ANDREIGHA MIHALY, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 06-228 Erie |
| MICHAEL J. ASTRUE, ) Commissioner of Social Security, ) ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 29th day of May, 2007, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 9] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Andreigha Mihaly, by and through her mother, Tiffany Rodebaugh. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin<br>
United States District Judge

cm: All parties of record.